UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALBERT E. NORTON, III, as Personal
Representative of the Estate of Albert E.
Norton, Jr.,                                          Case No. 02:04-cv-40376

        Plaintiff,                                  HONORABLE STEPHEN J. MURPHY, III

 -and-

AUTO CLUB GROUP INSURANCE
COMPANY, Subrogee of Albert E.
Norton, Jr.,

        Intervening Plaintiff,

v.

HAMILTON BEACH/PROCTOR-SILEX,
INC.,

        Defendant.

_____/

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON WRONGFUL DEATH CLAIM (D/E 89), DENYING MOTION TO
EXCLUDE EXPERTS AND DENYING MOTION FOR SUMMARY JUDGMENT (D/E 98)**

This is an action for injuries resulting from a house fire that was allegedly caused by

a toaster manufactured by defendant Hamilton Beach/Proctor-Silex (hereinafter "Hamilton

Beach").  This matter comes before the Court on three motions by defendant Hamilton

Beach.  The first is a motion for summary judgment on plaintiff Albert Norton's wrongful

death suit.  The second is a motion by the defendant to exclude plaintiffs' experts.  The

third motion is for summary judgment on the grounds that plaintiffs are unable to establish

the elements of a products liability claim under Michigan law.

I.    <u>FACTS</u>

For the purposes of the summary judgment motions the Court views the facts in the record in the light most favorable to the plaintiff.  *Brosseau v. Haugen*, 543 U.S. 194, 195, n.2 (2004).

A.  <u>The Fire</u>

This case arises from a fire that occurred in Royal Oak, Michigan, on January 23, 2004.  On the morning of that day, plaintiff's decedent, Albert Norton, Jr., was alone in his kitchen preparing breakfast.  He made coffee in an electric percolator.  (Norton Dep. p 18-19).  He cooked eggs and bacon on the electric stove. (Norton Dep. p. 21-22).  He also tried to make toast in a toaster produced and sold by defendants Hamilton Beach/Proctor Silex (hereinafter "Hamilton Beach").  Norton had owned the toaster for about one and one-half years at the time of the fire.  (Norton Dep. p. 40).  It was used about four times a week during that time to toast white bread and occasionally frozen waffles.  (Norton Dep. p. 42-43).  The toast burned twice that morning.  (Norton Dep. p.22).  Mr. Norton then turned the toaster down. (Norton Dep. p. 22).  Mr. Norton testified that he heard a sound from the toaster and observed a spark coming from the toaster.  (Norton Dep. p. 25-26).  A second, larger spark came from the toaster.  (Norton Dep. p. 27).  Mr. Norton tried to pull the cord out of the toaster, but by that time a fire had started in the kitchen.  (Norton Dep. p. 19). According to Mr. Norton, the toaster was the only appliance plugged in at that time. (Norton Dep. p. 29).  Mr. Norton was forced upstairs by the fire and was rescued by the fire department from an upstairs window.  (Norton Dep. p. 30).[1]

_____

[1]Hamilton Beach argues in its Motion to Exclude Experts and for Summary Judgment on the issue of products liability that Mr. Norton's testimony on these points is inconsistent

B.  <u>The Investigation</u>

The Royal Oak Fire Department extinguished the fire.  (Defendant's Motion for Summary Judgment and Motion to Exclude, Exhibit A ("Incident Report")).  The Royal Oak Fire Department Incident Report filed after the fire contains a narrative by Paul Benedict stating that (1) the area of most intense burn appeared to be located at the kitchen counter to the left of the stove, (2) there was a toaster and percolator located on this section of the counter, (3) both the toaster and the percolator were plugged into a power strip, (4) the control knobs on the stove indicated they were all in the "off" position, (5) a pan was on the stove top and the bottom of the pan and the surface of the burner were clean, and (6) major fire damage appeared to be confined to the kitchen.  The report concluded that "[t]he origin of the fire is at the kitchen counter at the site of the toaster and coffee pot, and until such time any different evidence is produced, the cause of ignition is undetermined."  (Incident Report at 10).

C.  <u>Mr. Norton's Physical Condition</u>

Mr. Norton had a history of serious medical conditions that predated the fire.  He suffered from diabetes, arthritis, prostate cancer and a chronic obstructive pulmonary disease.  (Motion for Summary Judgment on Wrongful Death, Exhibit C, Deposition of Albert Norton, III ("Norton III Dep."), p. 34-36; Exhibit D, Deposition of Steven Korotkin ("Korotkin Dep.") at p. 14-16).   He smoked for 40 years, quitting 20 years before the fire,

---

and contradictory.  For purposes of the present motions, however, the Court takes the testimony and all inferences arising from it in the light most favorable to the non-moving party.

and was characterized by his pulmonologist Dr. Millman as a "100 pack a year smoker." (Motion for Summary Judgment, Exhibit E, Deposition of Bruce Millman). Mr. Norton had also been taking amiodarone, a prescription medication for his heart condition, for two years prior to the fire. (Motion for Summary Judgment on Wrongful Death, Exhibit B-1, Miller Report). The chief risk of amiodarone is pulmonary fibrosis. (*Id.*; Buckley Report).

After escaping from his burning house, Mr. Norton was taken to Beaumont Hospital in Royal Oak, where he was treated for smoke inhalation. (Incident Report at 8). Dr. Bruce Millman conducted a pulmonary disease consultation on Mr. Norton's admission to Beaumont Hospital. (Plaintiff's Response to Motion for Summary Judgment on Wrongful Death, Exhibit B, Pulmonary Disease Consultation). Mr. Norton was on life support from January 23 to January 28, 2004, and was again intubated on February 7 on Dr. Millman's direction for airway protection. (*Id.*, Exhibit G, Bronchoscopy Report).

Mr. Norton remained at Beaumont Hospital for 29 days for this initial stay and was discharged to the West Bloomfield Nursing Home and Convalescent Center on February 23, 2004 (Plaintiff's Response, Exhibit D, Discharge Report). He remained at the nursing home until June 24, 2004, at which point he was taken to the hospital with complaints of shortness of breath. (Plaintiff's Response, Exhibit H, Admission Record). He was discharged back to the nursing home three days later, where he remained until he was discharged in mid-July. He was admitted to the hospital again on September 15, and discharged the following day. *Id.* He was admitted again on October 8, 2004, and remained 3 days. *Id.* He was again admitted to the hospital on October 16, for 5 days. *Id.* He was again admitted to the hospital from November 13 to November 26, from December 13 to December 22, 2004, and on January 4, 2005 and again on January 11, 2005. *Id.* He

4

was transferred back to the nursing home on January 18, 2005 and remained there until February 12, 2005. *Id.*

Mr. Norton died in the hospital on February 13, 2005, approximately 13 months after the fire.  The death certificate identifies the causes of death as pulmonary fibrosis and congestive heart failure.

D. Investigation and Expert Testimony

The first investigator on the scene after the Royal Oak Fire Department was an investigator employed by Herndon Associates, Gary Kraft.  Herndon Associates was asked to investigate the origin and cause of the fire on behalf of Rich Taglione of the Auto Club. (Intervening Plaintiff's Opposition to Motion to Exclude, Exhibit 4A at p.1).   The Herndon Associates investigators interviewed Fire Marshal Paul Benedict of the Royal Oak Fire Department and obtained the toaster, percolator and power strip that had been removed from the Norton house.  *Id.* at 3-4.  On February 12, 2004, the Herndon Associates investigators turned these over to Charles Fricke for examination.   Based on its investigation, the Herndon investigators concluded that the fire was accidental, that it originated within the kitchen at the counter top, and that the cause of the  fire was related to an electrical fault. *Id.* at 9.

The plaintiffs' experts on the cause of the fire are Charles Fricke and Robert Miller. Mr. Fricke is an expert witness for intervening plaintiff Auto Club, Norton's insurer, and was retained by Auto Club to examine the electrical appliances.  Fricke was retained by the Auto Club to determine if there was an electrical cause to the fire.  (Motion to Exclude and For Summary Judgment, Exhibit J, Fricke Deposition).  Mr. Fricke has a BS in Electrical Engineering and Engineering Administration, two professional engineering registrations and

5

a MBA, and has attended numerous investigative seminars related to fire investigation.  His proffered area of expertise is in forensic electrical engineering investigations.  Fricke CV. Robert Miller of Rimkus Consulting  Group was retained by counsel for Mr. Norton.  Mr. Miller has a BS in  Electrical Engineering and an Associate in Applied Science degree in Electrical Technology, and has taken graduate studies in polymer chemistry and electrical engineering.   Miller Report.   His proffered area of expertise is in failure analysis on electrical products and equipment.  *Id.*

Defendants experts are John J. Datovech, Hamilton Beach's Manager of Product Assurance and Licensing Quality, and K. Scott Barnhill of Investigative Forensic Specialists.   Mr. Datovech has a BS in Mechanical Engineering and a Masters of Engineering Administration, and has attended five professional seminars related to fire investigation in 2001 and 2002. ( Motion to Exclude and for Summary Judgment Datovech CV, Exhibit B 1-B).  Mr. Barnhill has a BS in Material Science and Engineering and a Masters of Engineering, and his proffered expertise is in origin and cause investigations for fire and explosions, product analysis and testing and general reconstruction.  (Motion to Exclude and for Summary Judgment, Exhibit C-1, Barnhill Report CV ).

The parties were not able to agree on dates to conduct a complete examination of the toaster.  The plaintiffs' representatives conducted a partial non-destructive examination of the toaster on December 6, 2005.  Plaintiffs' experts were deposed on December 19, 2005 (Fricke) and on December 28, 2005 and June 8, 2006 (Miller).   A destructive examination of the toaster was conducted on January 26, 2006, attended by defendant's experts and Mr. Fricke, and Mr. Miller was unable to attend.  Plaintiffs assert that defendant prevented Mr. Fricke from fully disassembling the toaster at this point. Mr. Miller issued a Second

6

Supplemental Report on March 27, 2007, following this examination and following the

report of defendant's expert John Datovech (Plaintiff's Response, Exhibit K).   Miller's

conclusions included (1) the building wiring and wiring devices near the area of the fire

origin were not the cause of the fire; (2) the power strip was not the cause of the fire; (3)

the percolator was not the cause of the fire; (4) the toaster was the only item examined that

exhibited abnormal conditions; (5) the toaster was energized at the time of the fire; and (6)

the fire was caused by a product defect that created a current overload, which caused the

main switch contacts to weld together, preventing the toaster from turning off.

A final, completely destructive, examination of the toaster was conducted on April 19,

2006.   Mr. Miller issued another supplemental report (Plaintiff's Response to Motion to

Exclude, Exhibit D).   In this report, Mr. Miller states as follows:

> Failure sequence:
> Before his death, Mr. Norton provided testimony that he had attempted to make toast on the morning of the fire.  The first two attempts resulted in burnt toast.  The third attempt resulted in sparks from the rear of the toaster.  This is where the toaster's main switch is located.
> The darkness of the toast is adjusted by the user to the desired degree of doneness.  As the control is turned, the physical distance between the contact pads is changed by a cam.   Tension is applied to the stationary portion of the temperature control by means of a spring.  When the contacts come together, an electrical circuit is made to the solenoid which electromagnetically releases the latch, allowing the food lifter to rise and the rod disengages the paddle of the main switch.  The natural spring properties of the switch leaf allow the switch to return to the normal open position.
> It is my opinion that the paddle may only partially release when the bread holder rod is raised. (See Photograph 4).  While the switch does open, pressure remains on the switch leaves which push the leaves towards the contacts.  With increased use, the switch leafs become permanently deformed which reduces the physical spacing between the contacts.  When the contacts are closed and opened, small arcs will occur with each operation leaving a distinctive surface texture on the face of the contacts.
> The rough surfaces of the contacts get progressively worse with each operation of the toaster.  This continues until the point to point contact generates sufficient heat to weld the contacts closed (Photograph 8 shows contact pattern consistent

with a  welded contact).  When the main switch contacts welded together, power
was applied to the toaster even though the thermal control activated releasing the
food carriage and raised the switch control rod.
   With the toaster energized and with bread in the food carriage, the bread ignited
which conveyed flame to the nearby paper towel holder mounted on the wall, the
bottom of the kitchen wall cabinet and the enclosure of the toaster.

Exhibit D, p. 4-5 (quoted in Plaintiff's Response to Motion to Exclude at 4-5).

Mr. Miller also offers the opinion that the Proctor-Silex toaster could be made safer

through the addition of a thermal cutoff that would have cut power to the welded contacts

in the toaster.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary

judgment "should be rendered if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary

judgment is appropriate if the moving party demonstrates that there is no genuine issue of

material fact regarding the existence of an essential element of the nonmoving party's case

on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th

Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and

draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St.

Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or

permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The

moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, "when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate." *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

9

III.   <u>MOTION FOR SUMMARY JUDGMENT ON WRONGFUL DEATH CLAIM</u>

Hamilton Beach argues that summary judgment is appropriate on plaintiff Albert Norton's wrongful death claim because plaintiff cannot prove that Norton's death was caused by injuries sustained by the fire allegedly caused by the Hamilton Beach toaster. It argues that, under the Michigan Wrongful Death Act, plaintiffs are required to prove that a defendant's allegedly wrongful act caused the decedent's death, and that plaintiffs cannot prove that the smoke inhalation was the cause of Norton's death 13 months later.  Plaintiffs argue that the question of whether Mr. Norton's death was caused or exacerbated by the smoke inhalation is a question of fact for the jury to decide, and therefore summary judgment should be denied.

.Hamilton Beach points to the fact that the death certificate and the autopsy report both attribute Mr. Norton's death to pulmonary fibrosis and congestive heart failure, both of which conditions Hamilton Beach argues existed prior to the fire.  With regard to Mr. Norton's congestive heart failure, Hamilton Beach argues that condition preceded the fire that occurred in January 2004.  They point out that he was under the care of a cardiologist, Dr. Korotkin, and that Dr. Korotkin testified that in May 2000 Mr. Norton had a bad heart. Dr. Korotkin saw possible chronic obstructive pulmonary disease along with congestive heart failure in X-rays taken of Norton in 2003 (Motion for Summary Judgment on Wrongful Death at 7).  Hamilton Beach asserts that "Korotkin cannot and will not offer an opinion that smoke inhalation compromised or contributed to Norton's cardiac condition." *Id.* at 7-8. Hamilton Beach also points to Dr. Korotkin's deposition statement that "I don't think it had - the smoke inhalation injury by itself, I don't think it had a direct effect on his heart condition." *Id.* (quoting Korotkin Dep. at 33).  Hamilton Beach also offers the affidavit of Dr.

10

Lynn Miller, a cardiologist, who asserts that there is no relationship between the smoke inhalation and Norton's congestive heart failure.  Miller Aff. ¶ 7b.

As to the pulmonary fibrosis that is also listed as a cause of Mr. Norton's death, Hamilton Beach asserts that there is no testimony that the smoke inhalation caused Mr. Norton's pulmonary fibrosis.  Hamilton Beach points out that Dr. Korotkin testified that chest x-rays taken of Mr. Norton in 2000 reveal evidence of possible chronic obstructive pulmonary disease, and that by January 8, 2003 he saw changes suggesting the possibility of chronic lung disease.  (Motion for Summary Judgment on Wrongful Death p. 8 (quoting Korotkin Dep. at 21-23)).  Hamilton Beach also points out that Mr. Norton had been taking amiodarone to treat his cardiac arrhythmia since late 2001, and that a well-known side effect of amiodarone is pulmonary toxicity leading to pulmonary fibrosis.  *Id.* (citing Buckley Report p. 2 ¶ 3, Millman Dep. 76-77; Korotkin Dep. 24).  Hamilton Beach asserts that none of plaintiffs' physicians will testify that Mr. Norton's death was the result of smoke inhalation, but that Hamilton Beach's expert, Dr. Buckley, will testify to the contrary that Mr. Norton's death was not the result of smoke inhalation.  *Id.* at 9-10 (citing Buckley Report ¶ 5, Buckley Aff. ¶¶ 7, 8).

Plaintiffs argue in response that the evidence of Mr. Norton's doctors shows that, while Mr. Norton had health issues prior to the fire, the injury he suffered from the smoke inhalation from the fire was the catalyst that started a downward spiral from which Mr. Norton never recovered.  They point out the fact that Mr. Norton was in and out of the hospital for the 13 months between the fire and his death.  They offer the deposition testimony of Dr. Korotkin, in which he testified that Norton "was doing fine and then he had this smoke inhalation and then pneumonia, and he never really recovered from that."

11

(Plaintiff's Response to Summary Judgment Motion on Wrongful Death at 4, *quoting* Korotkin Dep. p. 8). Dr. Korotkin also testified that "the smoke inhalation compromised his prior condition, added to his prior condition." *Id.* Furthermore, Dr. Walsh, another of Mr. Norton's physicians, testified that Mr. Norton never returned to the lifestyle he enjoyed prior to the fire and the smoke inhalation shortened his life. *Id.*[2] They argue that it is for the jury to decide whether or not they believe that Mr. Norton's pulmonary fibrosis was caused by or exacerbated by the smoke inhalation suffered in the house fire.

The question here is whether plaintiff has offered enough evidence that Norton's death was "caused" by defendant's alleged wrongful act to survive summary judgment. Plaintiff does not have any expert that testifies outright that the fire in January 2004 caused Norton's death in February 2005. But plaintiff does offer evidence that suggests that the fire may have been a factor in hastening his death. Accordingly the Court must determine whether this evidence is sufficient under Michigan law to survive the present motion for summary judgment.

M.C.L. § 600.2922 only allows a claim for wrongful death when the alleged wrongful act caused the death or the injuries resulting in death. The plaintiff needs to show both cause in fact and legal cause to be successful in establishing a connection that the smoke inhalation caused the death of Mr. Norton. *See Skinner v. Square D Co.*, 445 Mich. 153 (1994). A plaintiff may prove that a defendant's negligence was the cause in fact of plaintiff's injury using circumstantial evidence, but such circumstantial evidence "must

---

[2]Defendant's argue that Dr. Korotkin's testimony is inadmissible on this point because he is a cardiologist and the point at issue is Mr. Norton's lungs. Since this is not a medical malpractice claim, the Court will indeed consider Dr. Korotkin's testimony on this point.

facilitate reasonable inferences of causation, not mere speculation." *Skinner*, 445 Mich. at 164.

Hamilton Beach cites *Jenkins v. Patel*, 471 Mich. 158, 164 (2004) for the proposition that there is no common law right to recover damages for a wrongfully caused death. Rather, the Michigan Wrongful Death Act ("MWDA"), M.C.L. § 600.2922 is the sole remedy for injuries resulting in death.  The MWDA requires that the plaintiff prove the death or injury resulting from death, was caused by the wrongful, neglectful, or fault of another. Plaintiffs point out in response that under Michigan law there can be more than one proximate cause of death.  *Allen v. Owens-Corning Fiberglas Corp.*, 225 Mich. App. 397, 401 (1997).

The Court finds that the plaintiff Norton has come forward with sufficient evidence to avoid summary judgment on the issue of wrongful death.  Expert testimony is required to show causation in a case of medical malpractice.  *Pennington v. Longabaugh*, 271 Mich. App. 101, 104 (2006) (*citing Dykes v. William Beaumont Hosp.*, 246 Mich. App. 417, 478 (2001) and *Thomas v. McPherson Cmty. Health Ctr.*, 155 Mich. App. 700, 705 (1986)). The Court, however, has been unable to find any Michigan case that requires expert testimony to establish the cause of a death in the cases not involving medical malpractice, and such a requirement would seem to violate the well-established principle that cause may be established by circumstantial evidence.  *See Skinner*, 445 Mich. at 160 (citing cases permitting circumstantial evidence to establish causation in cases of products liability). Furthermore, there may be more than one proximate cause of an injury.  *Johnson v. Henry Ford Hosp.*, No. 250874, 251542, 2005 WL 658820 at * 6 (Mich. App. March 22, 2005) (*citing Hagerman v. Gencorp Automotive*, 457 Mich. 720, 729 (1998)).

Here, plaintiff has produced evidence from which a jury could conclude that the fire caused an injury to Norton's lungs which led to his initial hospitalization and contributed to his subsequent hospitalizations. Combined with the testimony of plaintiffs' experts, this evidence is sufficient to establish a logical chain of cause and effect rather than speculation as to the circumstance surrounding death. Taken in the light mostr favorable to the plaintiff, the evidence is sufficient to submit to a jury as *prima facie* proof of the claims. Therefore, the Court will deny defendant's motion for summary judgment on plaintiff's wrongful death claims.

IV.    MOTION TO EXCLUDE PLAINTIFFS' EXPERTS

Hamilton Beach has moved to exclude certain testimony of Robert Miller, the proposed expert of plaintiff Norton, as personal representative of the estate of Albert E. Norton, Jr. (the "Estate") and of Charles Fricke, proposed expert of intervening plaintiff, Auto Club Group Ins. Co. ("Auto Club") pursuant to Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, Hamilton Beach argues that Robert Miller's and Fricke's testimony concerning the alleged defective design of the subject toaster and causation are inadmissible under Rule 702 and the standards articulated in *Daubert*.[3]

---

[3]    For purposes of this motion, Hamilton Beach does not appear to challenge either Fricke or Miller on the grounds of their qualifications as experts, except as to their opinions regarding their proposed alternative toaster design, or the bulk of their testimony, which includes Fricke's examination of the site of the fire and several examinations by one or both witnesses of the remains of the toaster at issue. Further, while both sides discuss certain alleged discovery abuses in their papers on both sides, these are essentially side issues, and they do not go to the heart of the claims of inadmissibility. Thus, the Court will not at this time address the claims. The defendants outline what they deem the plaintiffs' "shifting theories" of causation, but in light of the claims by plaintiffs that the theories evolved in part based on their difficulty in scheduling a destructive examination of the toaster, the Court

For expert testimony to be admissible, it must comply with Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 requires the trial judge to exercise a gatekeeping role when considering the admissibility of expert testimony.  *Daubert*, 509 U.S. at 597. [4]

The Supreme Court in *Daubert* found that, when faced with a proffer of expert testimony, a trial court must first determine under Rule 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."   *Daubert*, 509 U.S. at 592.  The trial court is required to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93.  Although the  Supreme Court declined to set out a definitive checklist or test, it held that a trial court could properly consider: (1) whether the expert's theory or technique can be (and has been) tested; (2) whether the theory or technique has been subject to peer review; (3) the known or potential

---

will also not base its ruling on this argument, which is also a side issue.  Instead, in this opinion, the Court addresses only the current proffer of testimony by the experts at issue, and defendant's substantive challenge to that testimony.

[4]*Daubert* has been technically superceded by the 2000 revisions to Rule 702 of the Federal Rules of Evidence, which incorporated the holding of that case in the text of the rule.  *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).  Courts, however, still apply the holding of *Daubert*, so this Court will follow its analysis.

rate of error; and (4) the general acceptance of the theory or technique.  *Id.* at 593-94.  The inquiry is to be flexible, and the focus is to be on the principles and methodology employed, not on the results achieved.  *Id.* at 594-95.  The burden of establishing the admissibility of expert testimony rests on the party offering the testimony.  *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

To evaluate the admissibility of the expert testimony at issue, the Court must consider the purpose for which the testimony is offered.  Plaintiffs seek to offer Miller and Fricke's testimony to establish that a defect in the toaster caused the fire that injured Norton.  Most significant is the relevance of Miller's and Fricke's testimony as to the elements of defective design, since Hamilton Beach has also moved for summary judgment under Fed. R. Civ. P. 56.   In its summary judgment motion, Hamilton Beach argues that, without Miller and Fricke's testimony, plaintiffs cannot offer competent, admissible evidence that (1) the toaster which is the subject of this action was defective at the time that it left Hamilton Beach's control; (2) that a practical and technically feasible alternative design was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product; and (3) that the allegedly defective design caused the fire at issue. Therefore, the Court will address the admissibility of the Fricke and Miller testimony as to these elements.

A.  Elements of Design Defect Claim and Admissibility of Plaintiffs' Expert Testimony

As discussed in further detail below, in the portion of this opinion dealing with Hamilton Beach's motion for summary judgment on product liability, to prove a design defect claim under Michigan law, a plaintiff must offer evidence showing that a) the product at issue was not reasonably safe at the time it left the control of the manufacturer, and b) according to

16

generally accepted production practices, a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product.  M.C.L. § 600.2946(2).  Hamilton Beach argues that (1) plaintiffs' evidence as to the specific defect in the Hamilton Beach toaster is inadmissible under *Daubert* and Rule 702, and (2) plaintiffs' proposed alternative design opinion is also inadmissible under *Daubert* and Rule 702.  Hamilton Beach argues that, without this testimony, plaintiffs have no evidence of a "design defect" and summary judgment is appropriate.

The plaintiffs propose to offer the testimony of Miller and Fricke that there was a specific defect in the design of the Hamilton Beach toaster owned by Norton that caused the toaster to be unable to be turned off, which caused the bread in the toaster to ignite and also caused the fire that burned the Norton residence and injured Mr. Norton.  Miller's causation theory is that a defect in the toaster eventually caused the main switch contacts in the toaster to weld together, which did not allow the power to be turned off, causing the bread in the toaster to ignite and transfer fire to the bottom of the kitchen wall cabinet located directly above the toaster.  (Miller Report dated February 23, 2006, Response to Motion to Exclude and For Summary Judgment, Exhibit C ("First Miller Report") at 2.[5]

Miller's theory as to the specific defect in the toaster that allowed this to happen is a bit more complicated.  He proposes to testify that, in its normal operation, the toaster at issue is turned "on" by depressing the food lifter handle, or lever, which engages the main

---

[5]Hamilton Beach is primarily challenging Miller's testimony, and challenges Fricke's testimony to the extent that it relies upon Miller's testimony. Therefore, the Court will focus its analysis on Miller's testimony.

switch by depressing a paddle which pushes the main contacts closed. (Miller Supplemental Report dated May 16, 2006, Response to Motion to Exclude and For Summary Judgment, Exhibit D ("Second Miller Report") at 2). This creates a circuit and energizes the nichrome heater elements located in the center and at both sides of the toaster. When the food lifter handle is fully depressed, the spring loaded food carriage is mechanically latched in the down position and remains down until it is either released by the user or until the thermal control activates. *Id.* When the thermal control reaches its set point, the solenoid activates and electromagnetically draws in a steel plate which releases the latch and allows the spring loaded food carriage to pop up the food product. *Id.* at 2-3. As the food carriage rises, the rod engaging the main switch paddle also rises, causing the contacts to open and turn the toaster "off." The switch leaf is formed with a bend such that it has the propensity to remain in the open position. *Id.* at 3. This portion of Miller's and Fricke's proposed testimony appears to be undisputed.

As to the claimed defect in the toaster, and how it allegedly caused the fire, Miller proposes to testify that a destructive examination of the toaster done on April 19, 2006 shows evidence that the toaster was energized, or "on" when the fire occurred. *Id.* Specifically, Miller proposes to testify that both switch leaves show arcing damage above the contacts, and "[t]his could only occur if the toaster was energized at the time of the fire." *Id.* The remaining portions of the main switch contact pads were heavily pitted and were welded together. *Id.* The contact pads showed contact arcing and, although at the time of the inspection the contacts were separated, there was evidence of material transfer from one contact pad to another, which is an indication that the contact pads were also welded together, although Miller agreed with Datovech that this could have been caused by melting

18

from the fire.  *Id.*  The middle heater had its nichrome heater elements melted at several locations, not mechanically fractured, which in Miller's opinion could be caused by melting from the burning toast and the main switch holder.  *Id.*  Miller states that the solenoid was electrically open and X-rays revealed no indication of beading at the fractured ends. *Id.* at 4.  Miller opines that the solenoid operated properly and raised the food carriage.  *Id.*

As to the specific defect in this toaster that Miller claims caused it to be energized despite being in the off position and to cause the fire, Miller opines that the paddle that closes the switch leaves may only partially release when the bread holder rod is raised. Second Miller Report at 4.  He opines that, when such a partial release occurs, pressure would remain on the switch leaves which push the leaves toward the contacts.  *Id.*  With increased use, Miller opines, the switch leaves become permanently deformed, which reduces the physical spacing between the contacts.  *Id.*  When the contacts are closed and opened, small arcs will occur with each operation leaving a distinctive surface texture on the face of the contacts, which rough surface will get progressively worse with each operation of the toaster.  *Id.*  Miller opines that this continues until the point to point contact generates sufficient heat to weld the contacts closed.  *Id.*  Once the contacts were welded closed, the toaster remained "on" even though the thermal control activated releasing the food carriage and raising the switch control rod.  *Id.*  With the toaster "on" and with bread in the food carriage, the bread in the toaster caught fire, transferring flame to a nearby paper towel holder mounted on the wall, the bottom of the kitchen cabinet, and the inside of the toaster.  *Id.* at 5.

Miller opines that the reason that the movable contacts eventually became welded together is that, over time, with the heat from the toaster, the contacts can anneal and may

19

lose their "memory," and it is this loss of memory that allows the moveable contact leaves to move closer to the fixed contacts until arcing occurs and they weld together.  (Miller Dep. Vol. II, p. 151-52 (cited in Motion to Exclude and For Summary Judgment at p. 18)).

Hamilton Beach challenges this testimony as lacking sufficient foundation.  Hamilton Beach points out that Miller admits the contacts were opened when he examined the subject toaster. It states that the sole basis for Miller's opinion that the leaves might move is his visual observation of an exemplar toaster on May 5, 2006.  They point out that Miller testified that he cycled the exemplar approximately 20-30 times electrically or manually; that he admits that in most cases the paddle came to a horizontal position but in some situations it did not, but in all cases observed the paddle still opened. (Motion to Exclude and For Summary Judgment at 19 (citing Miller Dep., Vol. II at 135-137, 161)).

Hamilton Beach points out that Miller did not follow an established protocol for examination of the exemplar: he did not take notes; his only documentation was to photograph the toaster during one of its cycles; he never measured the gap between the contacts, and could not say whether the gap at the end of his examination was any different than the gap at the start.  He did not determine how close the contacts must be for arcing to occur.  He could not say how many cycles it would take for his paddle theory to result in failure of the switch contacts, or if he could produce a failure after about 300 cycles, the number of cycles Hamilton Beach estimates the Norton toaster was cycled.  The number of cycles is also far short of the 6,000 cycles required for the toaster's ANSI/UL rating, and far short of the 1,600 cycles that Hamilton Beach has tested the switch of the toaster.  Miller conceded in his deposition that he did not know the specific composition of the contacts, which Hamilton Beach argues is necessary to know if the material would in fact

20

deform as postulated. Finally, Hamilton Beach argues that Miller's failure to conduct experiments to recreate the conditions that he claims occurred in the Norton toaster, in which the contacts fused together, makes his testimony inadmissible under the standard articulated in *Daubert*. This failure to validate the plaintiffs' paddle theory with testing is what Hamilton Beach argues is most fatal to plaintiffs' theory.

Generally, the trial court is given a good deal of discretion in its determination of whether proffered testimony meets the requirements of Fed. R. Evid. 702 and *Daubert*, and in many cases the appellate court merely determines that the district court did not abuse its discretion in admitting or excluding expert testimony. *See, e.g., Pride v. BIC Corp.*, 218 F.3d at 578 (holding district court did not abuse its discretion in excluding plaintiff's expert testimony on defect and cause of fire in cigarette lighter case). In *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299 (6th Cir. 1996), however, the Sixth Circuit examined a case in which it was determined that the trial court abused its discretion in admitting the testimony of a biomechanical engineer on the topic of defect. The engineer in *Smelser* testified, in an automotive accident, that a shoulder belt was defective and caused the plaintiff's injuries but the lap belt in the pickup truck was not defective. The Sixth Circuit held that the trial court abused its discretion in admitting the testimony because, first, the trial court had failed to consider any of the factors outlined in *Daubert*, and, second, because the testimony was not "derived by the scientific method and capable of validation." *Smelser*, 105 F.3d at 304.

The court concluded that the testimony of plaintiff's expert, that the shoulder belt, but not the lap belt, was defective and caused the plaintiff's injuries, was not based on "good science" because the expert, Huston, (1) failed to perform any tests on the lap belt, but

21

concluded that it was in good working order, (2) conducted no testing to confirm his conclusion that the shoulder belt was damaged in an earlier accident, (3) failed to adequately document the testing he did on the shoulder belt, and the rate of error, "so that the test could be repeated and its result verified and critiqued", and (4) failed to discover and apply the degree to which the restraint was mounted in the vehicle in his testing of the restraint.  *Id.*  The court found that plaintiff had failed to establish that any of its expert's seat belt tests "were based on scientifically valid principles, were repeatable, had been the subject of peer review or publication or were generally accepted methods for testing seat belts in the field of biomechanics" and accordingly the testimony that the pick-up truck's shoulder belt, but not its lap belt, was defective should have been excluded.  *Id.* at 304-05.

The holding of *Smelser* is essentially that, for expert testimony to be admissible under Rule 702 and *Daubert*, the testimony must be based on "good science."  The testimony of the expert in that case was held not to be based on good science because the plaintiff did not establish that it was based on scientifically valid principles, that it was repeatable, that the principles were the subject of peer review or publication or were generally accepted methods for testing the subject matter, seat belts, in the field of biomechanics, the expert's area of expertise.

Another case in which the court of appeals determined that the trial court had abused its discretion in permitting expert testimony was *Cook v. American Steamship Co.*, 53 F.3d 733 (6th Cir. 1995), *overruled on other grounds by General Electric v. Joiner*, 522 U.S. 136 (1997).  In *Cook* the expert testimony at issue concerned a certain three-quarter-inch diameter manilla rope which broke and caused the plaintiff to fall under inclement conditions.  The plaintiff's expert, Timmons, testified that the rope was defective and

unsafe, while the defendants contended that the plaintiff had caused the rope to sever by accidentally burning it with the blow torch he was using.

The Sixth Circuit held that the district court had abused its discretion by admitting the Timmons testimony. The evidence demonstrated that Timmons incorrectly believed that a 13 foot section of line that he had sent out for testing was taken from the line that had severed, when in fact it had only been cut from the same spool as the one that had severed; that Timmons had performed no tests at all on the line that had actually parted aside from visually examining the parted section with the naked eye and with a low-power microscope, under which inspection he discovered char marks, and Timmons had only applied flame to a thin piece of rope that he brought with him to the court, which rope had nothing to do with the rope at issue in the case. The Sixth Circuit concluded that Timmon's testimony was not based upon scientific, technical or other specialized knowledge as required by Rule 702.

These opinions make clear that the Court is to apply the factors of *Daubert,* to the extent applicable, to establish whether the proposed testimony is based upon good science. Applying these factors to the proffered testimony, the Court finds that Miller and Fricke's testimony is sufficiently based upon "good science" to be admissible under Rule 702 and *Daubert*.

As to the first *Daubert* factor, whether the theories and principles have been tested, the Court holds that the proffered testimony of Miller and Fricke satisfies this factor in that it is based upon principles and theories that have been tested. While Hamilton Beach seeks to focus on whether Miller's theories have been tested as *applied to this toaster*, the Court finds that the correct focus is whether his theories and techniques are based upon

23

*principles* that have been tested. As stated by the advisory committee notes on the 2000 revisions to Rule 702, whether the expert's theory has been or can be tested means whether the theory "can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." Committee Notes on Rules, 2000 Amendments. When considered this manner, Miller's theories on causation are clearly based upon basic, well established and tested concepts generally applicable to electrical engineering. His opinions on the cause of the alleged malfunction within the toaster are based upon his observation of the toaster and his application of principles of electrical engineering to what he observed in both an exemplar toaster and the remains of the actual toaster. Contrary to Hamilton Beach's view, the Court finds that Rule 702 and *Daubert* require that valid expert testimony need only be based upon principles and theories that are good science, in that they have been tested by *someone* - it does not require that the expert test each and every principle upon which he bases his testimony. Likewise, to the extent that the factors of peer review and general acceptance apply, they are met here by the fact that the testimony of Miller and Fricke is based upon generally accepted principles of electrical engineering that have been subject to peer review.

The third *Daubert* factor, the known or anticipated rate of error, does not appear to be met here; the plaintiff has not offered evidence that shows whether or how often the proffered testimony of their experts is based upon methods that may produce false results. While this weakens the case for admissibility of the evidence, it is not fatal, since *Daubert* emphasized that the factors listed were illustrative and non-exclusive, and not applicable in every case.

24

As to the other criticisms made by Hamilton Beach to the admissibility of Miller's and Fricke's testimony, the Court finds that these go to the weight of the expert evidence, and not its admissibility.  The fact that Miller did not test the applications of the engineering principles to the toaster, and that Hamilton Beach's experts did test the toasters impeaches Miller's testimony, but does not make it inadmissible.

B.  Plaintiffs' proposed testimony on alternate design

To state a claim for a defective product against a manufacturer, a plaintiff must establish that, at the time of production, there existed a practical and feasible alternative production practice that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others.  M.C.L. § 600.2946(2).

Plaintiffs therefore also offer testimony by Robert Miller on an alternative design of the toaster that he opines could have avoided the fire.  Miller offers to testify that virtually all heating appliances use a thermostat to regulate temperature and to shut down the appliance if a preset temperature is exceeded, but that the Hamilton Beach toaster owned by Norton does not contain either a temperature regulating or a temperature limiting control.  (Second Miller Report at 5).  The toaster's doneness control adjusts a cam which physically causes the stationary contact to move and varies the distance between the fixed and movable contacts and changes the time it takes to operate the solenoid.  *Id.*  There is no control on the internal temperature that the toaster achieves.  *Id.*

Based upon his examination and analysis of the toaster, Miller opines that the fire could have been prevented with the use of a thermal cutoff ("TCO"), which is an inexpensive fuse that disconnects the main power if the internal temperature of the toaster

25

exceeds a preset limit temperature, which temperature could be selected so that the thermal cutoff would operate before combustible materials in the toaster could ignite. *Id.* But Hamilton Beach argues that Miller's testimony on the suggested alternative design is inadmissible, first, because Miller is not qualified to opine as an expert on the alternative design of the toaster: he cannot identify another manufacturer that uses a TCO in its toaster; he has never designed a toaster or worked for an appliance manufacturer; he cannot state what the generally accepted production standards for toasters were at the time this toaster was manufactured.

Hamilton Beach also argues that Miller (and by extension Fricke) cannot opine on the alternative design theory because they have not done enough work to form such an opinion: they have not produced a prototype of the toaster; they do not identify what type of TCO should have been used; they do not specify the type and grade of the related conductors that would be required to connect the TCO to the rest of the circuit; they do not attempt to identify where the TCO should be located and do not evaluate how the inclusion of the TCO would affect the toaster's function.

Again, it appears to the Court that Miller, an electrical engineer who spent more than 30 years at Underwriters Laboratories, Inc., is sufficiently qualified to opine on the inclusion of a thermal cutoff in a toaster, despite never having designed a toaster himself. Hamilton Beach's other criticisms of the proffered testimony, while well stated, go to the weight of the testimony rather than its admissibility.

Hamilton Beach argues that Miller's proposed alternative design of a thermal cutoff fails to meet the *Daubert* standards for admissibility because Miller has not provided enough detail to analyze the proposed alternative. He does not specify the TCO

26

manufacturer, model or manufacturer specifications for the TCO, he does not say what additional design modifications inclusion of a TCO would require, he does not state whether the TCO would conform with the manufacturer's specifications and instructions, and, most importantly in Hamilton Beach's eyes, he has not created a prototype of a toaster with a TCO to determine whether it would be feasible, practical, or safer.

While the Court believes that Hamilton Beach's challenge to Miller's testimony on alternative design goes to the weight of the evidence rather than to its admissibility, and that it therefore must deny the motion to exclude Miller's testimony, these are complicated issues for the Court to decide on a cold record.   The Court has broad discretion to fashion procedures to determine the admissibility of evidence under Rule 702.  Because the issues are complicated, and because no evidentiary hearing has yet been held, the Court will deny defendant's motion to exclude without prejudice.  If the defendants choose to renew their motion to exclude, the Court will address the issues of the admissiblity of Miller's proposed alternative design at an evidentiary hearing to be held prior to the trial date in this case.

V.    MOTION FOR SUMMARY JUDGMENT ON PRODUCTS LIABILITY CLAIM

Hamilton Beach argues that summary judgment is appropriate on plaintiffs' products liability claim because plaintiffs cannot meet their burden of proof on all the elements of a products liability claim under Michigan law.   Plaintiff argues that Hamilton Beach's argument ignores plaintiff's claims for breach of implied warranty, which plaintiff argues has different elements than a products liability claim and requires different proof under the facts of this case.   As discussed below, the Court finds that plaintiff is not required to present evidence on all elements of a negligence products liability claim to sustain its claim for breach of warranty under Michigan law.

27

Michigan products liability law is codified at M.C.L. § 600.2946(2).   Section 600.2946(2) provides that in a claim against a manufacturer for harm allegedly caused by a production defect, the manufacturer is not liable unless the plaintiff proves both that (1) the product was not reasonably safe at the time it left the control of the manufacturer and (2) according to generally accepted production practices, a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirablility of the product.

The second element of Section 600.2946(2) reflects the "risk-utility test."  The Sixth Circuit has stated what the plaintiff must do to avoid summary judgment under this test:

Under Michigan's risk-utility test, a plaintiff must show:

(1) that the severity of the injury was foreseeable by the manufacturer;

(2) that the likelihood of the occurrence of the injury was foreseeable by the manufacturer at the time of distribution of the product;

(3) that there was a reasonable alternative design available;

(4) that the alternative available design was practicable;

(5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the defendant's product; and

(6) that the omission of the available and practicable reasonable alternative design rendered the defendant's product not reasonably safe.

*Croskey v. BMW of N. Am., Inc.*  532 F.3d 511, 516 (6th Cir. 2008) (*citing Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 738 (6th Cir. 2000) (other citation omitted)).

Hamilton Beach argues, first, that a plaintiff asserting a claim of defective design must produce expert testimony of a product defect, and, because they assert that the expert opinions of Fricke and Miller are inadmissible, the plaintiffs' products liability claims fail as

28

a matter of law.  Hamilton Beach argues, second, that plaintiffs must prove a practical and technologically feasible alternative to its toaster design, and without the testimony of their experts, plaintiffs cannot offer any evidence of this element.  Finally, Hamilton Beach argues that plaintiffs have provided insufficient evidence of causation arising from their alleged product defect, and without this evidence Hamilton Beach is entitled to summary judgment on this ground as well.  Since the Court, however, intends to deny the defendant's motion to exclude the plaintiff's expert witnesses, and it will therefore also deny defendant's motion for summary judgment on plaintiffs' claims based upon the alleged defective design of the toaster, which are premised on the exclusion of expert testimony.

Plaintiffs argue in the alternative, based on their claim of breach of implied warranty, that the elements set forth in M.C.L. § 600.2946(2) do not apply to their claim.  Instead, plaintiffs argue, the Michigan courts have held that a claim of defective design is distinct from a claim of breach of implied warranty.  They argue that, under such a claim, the product's lack of fitness for its intended purpose amounts to an actionable defect, and that a demonstrable malfunction is generally clear evidence of a defect.   Therefore, plaintiffs argue, the fact that Mr. Norton testified that the toaster sparked and started a fire is sufficient for the plaintiffs to survive a motion for summary judgment regardless of the admissibility of the expert testimony regarding the source of the defect.  Defendants maintain that relevant Michigan precedent holds that, in cases involving a claim against a manufacturer for injury caused by an allegedly defective design, the elements of breach of implied warranty merge with the elements of the design defect claim and that therefore the plaintiffs must come forward with evidence on all the elements of a claim of defective design in order to state a claim.

29

Plaintiffs rely on the case of *Kenkel v. Stanley Works*, 256 Mich. App. 548 (2003) in support of their argument.  *Kenkel* involved an automatic sliding glass door at the entrance of the Greenfield Rite Aid store that trapped the plaintiff while she was walking through the doors.  The defendants moved for a directed verdict on the ground that the plaintiff had failed to come forward with sufficient evidence of a defect to go to the  jury.

The Michigan Court of Appeals held that the trial court was correct in denying defendant's motion for a directed verdict on this ground:

> A product may not be reasonably fit for its intended or foreseeable use even if the product is "technically ... not defective...." *Bouverette*, supra at 399, 628 N.W.2d 86 (finding that a verdict in the defendant's favor on a negligence claim was not inconsistent with a verdict in the plaintiff's favor on a claim of breach of implied warranty). **Moreover, a plaintiff pursuing a claim of breach of implied warranty is not required to identify the precise defect in the product unless there are multiple actors to whom a malfunction could be attributed**. *Caldwell v. Fox*, 394 Mich. 401, 410, 231 N.W.2d 46 (1975);   *Snider v. Bob Thibodeau Ford, Inc.*, 42 Mich.App. 708, 713, 202 N.W.2d 727 (1972);   *Sundberg v. Keller Ladder*, 189 F Supp 2d 671, 676 (E.D.Mich., 2002) (decided pursuant to Michigan law). Furthermore, **the plaintiff is not required to demonstrate whether *the defect was caused by "design, material, assembly or a combination*...."** *Holloway v. Gen. Motors Corp.* (On Rehearing), 403 Mich. 614, 626, 271 N.W.2d 777 (1978). "**It is the injury inflicted on the plaintiff that entitles him to a remedy, not his skill in discovering precisely where defendant's manufacturing process went wrong**." *Id.*

*Kenkel*, 256 Mich. App. at 557-58 (emphasis added).

Accordingly, the plaintiffs argue that *Kenkel* stands for the proposition that, as here, a demonstrable malfunction is generally clear evidence of a defect in a breach of implied warranty case. The plaintiffs also maintain that *Kenkel* supports an argument that they have established causation sufficient to survive a motion for summary judgment.   The defendants in *Kenkel* argued that the plaintiff had failed to prove a causal connection

30

between an established defect and her injuries.  The court disagreed, and held that the

plaintiff's testimony alone was sufficient to establish causation:

> However, as we stated above, plaintiff's testimony was sufficient to establish causation. She testified at trial that the doors closed on her, held her in their grasp, and suddenly retracted, causing her to fall to the ground. The facts in *Skinner* are distinguishable from the facts in this case. There, the plaintiffs' decedent died almost immediately after the product allegedly malfunctioned and before he was able to tell anyone precisely what had occurred in the moments before his death.  *Id.* at 157-158.  Thus, the plaintiffs' theory of causation in Skinner was merely a possibility among other possibilities that were equally as probable, and the evidence in that case was speculative and insufficient to avoid summary disposition.  *Id.* at 171-172.

*Kenkel*, 256 Mich. App. at 560-61.  The court went on to state that the plaintiff's testimony

"provided the jury with a fact-based account of the incident that caused her injuries.

Plaintiff was not required to demonstrate by this testimony the precise defect that caused

the doors to malfunction  . . .   The jury was free to accept or reject the testimony of plaintiff

and [plaintiff's expert] in reaching its verdict. "  *Id.*

Plaintiff also cites *Olson v. Home Depot*, 321 F. Supp. 2d 872 (E.D. Mich. 2004), in

which this district court held that expert testimony was not required in a claim for breach

of implied warranty against the seller and manufacturer of a defective hand rail bracket, and

*Sundberg v. Keller Ladder*, No. 00-10117, 2001 WL 1397290 (E.D. Mich. Nov. 8, 2001),

*reconsideration denied*, 189 F. Supp. 2d 671 (E. D. Mich.  2002), in which this court found

that implied warranty claims do not require a plaintiff to specify the type of defect or present

expert testimony, but rather merely require a showing that something went wrong

consistent with a defect.

Hamilton Beach argues that, despite the the Court of Appeals' analysis in *Kenkel*,  the

Michigan Supreme Court has held in *Prentis v. Yale Manufacturing Co.*, 421 Mich. 670

31

(1984), that in cases alleging a defect in design against the manufacturer of an allegedly defective product, the elements of a design defect case merge with the elements of a breach of warranty.  In *Prentis*, the Michigan Supreme Court upheld the trial judge's refusal to charge the jury with breach of warranty in a case claiming injury resulting from a defectively designed forklift, when he properly instructed on a theory of negligent design. Hamilton Beach argues that, given this holding in *Prentis*, the plaintiff here cannot survive summary judgment without presenting evidence on every element of a defective design claim.   Hamilton Beach also cites the case of *Berry v. Crown Equipment Corp.*, 108 F. Supp. 2d 743, 757 (E.D. Mich. 2000), in which this court, relying on *Prentis*, dismissed the plaintiff's breach of warranty claim after dismissing his defective design claim because the plaintiff failed to offer qualified expert testimony.  The *Berry* case, like *Prentis*, also involved injuries sustained through the operation of a forklift.

*Prentis* involved a claim by the operator of a hand-driven forklift which surged, causing the operator of the forklift to trip and sustain injuries.  The plaintiff claimed that the defendants had defectively designed the "walkie hi-lo" forklift because it failed to provide a seat or platform for the operator, rendering it unreasonably dangerous.  To prove that the forklift was unreasonably dangerous, the plaintiff offered the testimony of two expert witnesses, a witness who held a Ph.D in experimental psychology, with an emphasis on human factors,  and a mechanical engineer, whose testimony was that the forklift was defective in that it failed to incorporate the operator into the design of the forklift as a "human factor."  Thus, the plaintiffs' theory of the case in *Prentis* was that the forklift was defective even when working as designed, because such a design created an unreasonable risk of injury.  The Michigan Supreme Court determined, under the facts of

that case, that the trial judge properly instructed the jury that it had to consider "whether the manufacturer took reasonable care in light of any reasonably foreseeable use of the product which might cause harm or injury." *Prentis*, 421 Mich. at 695 (citing *Caldwell v. Fox*, 394 Mich. 401 (1975)). The precise holding in *Prentis* was that "in this products liability action against a manufacturer for an alleged defect in the design of its product, where the jury was properly instructed on the theory of negligent design, the trial judge's refusal to instruct on breach of warranty was not reversible error." *Prentis*, 421 Mich. at 691. Hamilton Beach also cites *Bouverette v. Westinghouse Electric Corp.*, 245 Mich. App. 391, 395 (2001), in which the Michigan Court of Appeals cited to *Prentis* and noted in dicta that design defect claims and breach of warranty claims involve the same elements and the same proof.

Several courts in this district, when faced with the issue, have found that the Michigan Supreme Court opinion in *Prentis* does not preclude a separate claim for breach of implied warranty of merchantability against the manufacturer of an allegedly defective product. *See, e.g.*, *Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 676 (E.D. Mich. 2002) (when suing under warranty theory, plaintiff is not obliged to specify perceived defect or offer expert testimony); *Fire Ins. Exch. v. Electrolux Home Products*, No. 05-70965, 2006 WL 2925286 at *7, 9 (E.D. Mich. Oct. 11, 2006) (circumstantial evidence that defect in clothes dryer caused home fire sufficient to withstand summary judgment on breach of warranty claim); *Olson v. Home Depot*, 321 F. Supp. 2d 872, 877 (E.D. Mich. 2004) (distinguishing *Berry* and holding that the *Prentis* court explicitly limited holding to facts of that case). During the oral hearing of this matter, the defendants characterized the *Kenkel* decision as

33

something of a rogue opinion; however, the Court has found no case disavowing the decision in *Kenkel* since the Court of Appeals issued the decision.

The analysis in *Sundberg v. Keller Ladder* is instructive on this difficult issue. *Sundberg* involved a claim that the hooks on an aluminum extension ladder buckled and failed during normal use, causing injuries to the plaintiff. *Sundberg*, 2001 WL 1397290 at *1. The ladder had a 200 pound duty rating, the plaintiff weighed only 150 pounds, and the plaintiff testified that he never modified or serviced the ladder in any way. *Sundberg*, 189 F. Supp. 2d at 680. The plaintiff filed suit against the manufacturer of the ladder, asserting claims of negligence and breach of implied and express warranties. *Sundberg*, 2001 WL 1397290 at *1. The court precluded plaintiff's expert witnesses as a discovery sanction, and the defendants filed a motion for summary judgment, arguing, as defendants argue here, that summary judgment was required because without expert testimony plaintiff's products liability claim must fail. *Sundberg*, 2001 WL 1397290 at *4.

In considering the issue, the district court exhaustively reviewed Michigan law on the topic of products liability. It found that the law of products liability recognized three types of defects: manufacturing defects, design defects, and failure to give adequate instructions or to warn. *Sundberg*, 2001 WL 1397290 at *5. It also noted that where a plaintiff has been injured due to such defects, "Michigan recognizes two distinct causes of action for product failures: negligence and implied warranty." *Id.* (citing *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 12 (1995) and *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736-37 (6th Cir. 2000)).

> As a general rule, the negligence action focuses on the conduct of the manufacturer, whereas implied warranty focuses on the condition of the product.

34

> *Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 692, 365 N.W.2d 176, 186 (1984).
> These theories are not always mutually exclusive. When used to attack design
> and warning defects, the two theories may effectively require the same elements
> and proofs. *Bouverette v. Westinghouse Elec. Corp.,* 245 Mich.App. 391, 395,
> 628 N.W.2d 86, 90 (2001).  As a result, in design defect cases against a
> manufacturer, only a negligence cause of action is cognizable. *Prentis,* 421 Mich.
> at 693, 365 N.W.2d at 186. Nonetheless, the two causes of action remain
> separate theories with distinct elements. *Lagalo v. Allied Corp.,* 457 Mich. 278,
> 287 n. 11, 577 N.W.2d 462, 466 n. 11 (1998).

*Sundberg,* 2001 WL 1397290 at  * 5.

The court then went on to analyze the elements of the two causes of action.  The negligence cause of action "recognizes that manufacturers have a duty to use reasonable care to design and produce a product that is reasonably safe for its intended, anticipated or reasonably foreseeable use." *Id.* (citing *Prentis*, 421 Mich. at 694).  Under Michigan law, in order to demonstrate a design defect, the plaintiff has the heavy burden of proving actual fault on the part of the manufacturer through use of a six-factor test that balances the product's risk utility.  *Id.* at *5-6.   But the court found that the requirements for an implied warranty cause of action are less stringent.   "When alleging an implied warranty cause of action, the plaintiff need only show that (1) the product in question was defective when the defendant sold or otherwise placed it in the stream of commerce, and (2) that the defect caused her injury. A product is defective if it is not reasonably fit for its intended, anticipated, or reasonably foreseeable use."  *Id.* at *6 (citing *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 737 (6th Cir.2000); *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 34 (1995)).  The court held that implied warranty claims "do not require the plaintiff to specify the type of defect alleged: the mere showing that *something* went wrong consistent with the existence of a defect is sufficient."  *Id.* (emphasis in original) (citing *Caldwell v. Fox*, 394

Mich. 401, 410, 231 N.W.2d 46, 51 (1975); *Severn v. Sperry Corp.*, 212 Mich.App. 406, 413, 538 N.W .2d 50, 54 (1995); *Snider v. Bob Thibodeau Ford, Inc.*, 42 Mich.App. 708, 713, 202 N.W.2d 727, 730 (1972)). Because implied warranty claims do not require the plaintiff to specify the defect alleged, the risk utility test was inapplicable, and expert testimony was not required. *Id.* at *7. The court concluded that because the defendants never challenged the facts of plaintiff's fall, nor alleged that a ladder that collapses under the weight of a normal person would not breach a warranty, the plaintiff's claims were sufficient to state a claim under Michigan law. *Id.* at *8.

This Court finds the *Sundberg* analysis to be fully supported by Michigan case law, and persuasive. As in *Sundberg*, the product at issue is a simple one - a toaster. Applying the authority on implied warranties, there are facts in the record upon which the factfinder could find that a toaster that ignited and set fire to a kitchen was defective, and that such defect existed at the time the product left the hands of the manufacturer.

Further, the Court finds that the Michigan Supreme Court opinion in *Prentis* does not require otherwise. As noted above, the *Prentis* case dealt with injuries allegedly incurred through operating a forklift that failed to incorporate the "human factor." The forklift was not alleged to be malfunctioning in any way; instead, it was functioning the way it was intended but the plaintiff alleged that such function was nonetheless defective. The same alleged defect also formed the basis for the plaintiffs' breach of warranty claim. Thus, the Prentis court found *under the facts of that case* plaintiffs' negligence claim required the exact same proof as plaintiffs' breach of warranty claim.

36

Here, on the other hand, while the plaintiff is claiming that the toaster was defectively and negligently designed, he is also separately claiming that the toaster breached its implied warranty of merchantability in that, in igniting and causing the fire, it was not reasonably fit for its intended, anticipated, or reasonably foreseeable use.  Under the analysis in *Sundberg* and *Kenkel*, such a claim is distinct from a defective design claim and does not require proof on all elements of the risk utility test articulated in *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 738 (6th Cir. 2000).  The mere fact that the plaintiff is also asserting a claim of negligent design does not change this analysis:  under the Federal Rules, a party may assert as many separate claims or defenses as it has, regardless of consistency.  Fed. R. Civ. P. 8(d)(3).

Therefore, the Court finds that the plaintiff may state a claim for breach of the implied warranty of merchantability on the facts alleged, and will deny defendant's motion for summary judgment on products liability.

## ORDER

For the reasons stated above, it is hereby **ORDERED** that defendant's motion for summary judgment on wrongful death is **DENIED**; defendant's motion for summary judgment on products liability is **DENIED**; and defendant's motion to exclude plaintiffs' expert testimony is **DENIED WITHOUT PREJUDICE**; defendant may renew its motion to exclude the testimony of plaintiffs' witnesses by notifying the Court within 20 days of the date of this Order, and, if defendants do so, the Court will hold an evidentiary hearing prior to trial on the admissibility of the testimony.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
UNITED STATES DISTRICT JUDGE

Dated:  March 30, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 30, 2009, by electronic and/or ordinary mail.

s/Alissa Greer
Case Manager